Matter of Virginia OO. v Alan PP. (2023 NY Slip Op 01120)

Matter of Virginia OO. v Alan PP.

2023 NY Slip Op 01120

Decided on March 2, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:March 2, 2023

534441
[*1]In the Matter of Virginia OO., Respondent,
v
Alan PP., Appellant. (And Other Related Proceedings.)

Calendar Date:January 11, 2023

Before:Clark, J.P., Pritzker, Reynolds Fitzgerald, Ceresia and McShan, JJ.

Mack & Associates, PLLC, Albany (Barrett D. Mack of counsel), for appellant.
Lisa K. Miller, McGraw, for respondent.
Natalie B. Miner, Homer, attorney for the child.

Pritzker, J.
Appeal from an order of the Family Court of Tompkins County (Joseph R. Cassidy, J.), entered July 19, 2021, which granted petitioner's application, in a proceeding pursuant to Family Ct Act article 6, to modify a prior order of custody.
Petitioner (hereinafter the mother) and respondent (hereinafter the father) are the divorced parents of one child (born in 2012). The father has two additional children, an older child (hereinafter the older sibling) and a child born during the pendency of the proceedings (hereinafter the younger sibling). Pursuant to a January 2019 stipulated custody order, the parties were awarded joint legal custody of the child and the mother was designated as the custodial parent for child support purposes. The order provided that, during the school year, the father had parenting time with the child from Wednesday to Friday every other week and Thursday to Monday on the alternating weeks. During the summer, the parties had parenting time in alternating one-week periods, with the parent who did not have the child that week being granted parenting time for a two-hour dinner visit on Wednesdays. Thereafter, the parties filed numerous petitions against each other — including violation and custody modification petitions. As relevant here, the mother sought sole custody of the child, alleging that the child was suffering from anxiety due to the father's manipulative and controlling behavior. For his part, the father sought to modify the January 2019 order by reducing the mother's parenting time to alternating weekends. He additionally requested that the mother's parenting time be supervised and that mental health evaluations be ordered for the parties. A fact-finding hearing began in March 2020 and spanned 10 separate days, with the final day of testimony occurring in February 2021. During the course of the proceedings, three Lincoln hearings were held. Also, while fact-finding was ongoing, the parties filed numerous petitions and motions and, at the close of the mother's case, the father made a motion to dismiss based on a failure to establish a change in circumstances. His motion was denied.
Soon after the close of the fact-finding hearing, the mother moved to reopen the proof on the basis that she had obtained financial records which allegedly proved that the father and his wife (hereinafter the wife) had perjured themselves. She additionally requested that the father and the wife be held in contempt and that they be deemed unfit custodians of the child. Family Court temporarily granted the mother sole custody, suspended the father's parenting time and reopened the proof. After an appearance, the court issued a new temporary order granting the mother sole custody with the father having parenting time on alternating weekends. Thereafter, Family Court issued a decision granting, among other things, the mother sole legal custody of the child and primary placement. As to parenting time, Family Court provided that, during the school [*2]year, the mother is to have parenting time with the child nine nights in a row and the father is to have parenting time with the child five nights in a row, alternating. During the summer, the father and the mother have alternating two-week blocks of parenting time. An order was then entered upon the decision. The father appeals.
The father contends that Family Court erred in finding that the mother established a change in circumstances and, as such, in denying his motion to dismiss at the close of the mother's proof. "A parent seeking to modify an existing custody order must first show that a change in circumstances has occurred since the entry of the existing custody order that then warrants an inquiry into what custodial arrangement is in the best interests of the child" (Matter of Andrea II. v Joseph HH., 203 AD3d 1356, 1357 [3d Dept 2022] [internal quotation marks and citations omitted]; see Matter of Woodrow v Arnold, 149 AD3d 1354, 1356 [3d Dept 2017]). Notably, "an order entered on consent, without a plenary hearing, is entitled to less weight" (Matter of Whitcomb v Seward, 86 AD3d 741, 742 [3d Dept 2011]; see Matter of Youngs v Olsen, 106 AD3d 1161, 1163 [3d Dept 2013]). "A sufficient change in circumstances can be established where the relationship between joint custodial parents deteriorates to the point where they simply cannot work together in a cooperative fashion for the good of their child[ ]" (Matter of Youngs v Olsen, 106 AD3d at 1163 [internal quotation marks, brackets, ellipsis and citations omitted]; see Matter of Dorsey v De'Loache, 150 AD3d 1420, 1422 [3d Dept 2017]).
The mother's testimony demonstrates that the parties have difficulty communicating, especially when it comes to planning or executing custodial exchanges and vacations. The mother testified about the father recording exchanges of the child, which were occurring in a public supermarket. The mother stated that, since the time of the prior order, the child has displayed various forms of anxiety. There was testimony that called into question the father's ability to financially support the child, given his inability to pay child support for a year. The mother also testified that both parties had called the police on one another since the prior order. Given the foregoing, Family Court properly found that a change in circumstances had occurred due to, among other things, the ongoing conflict between the parties, which has caused issues in their ability to effectively communicate and make decisions regarding the child together (see Matter of Cecelia BB. v Frank CC., 200 AD3d 1411, 1413-1414 [3d Dept 2021]; Matter of David ZZ. v Suzane A., 152 AD3d 880, 881-882 [3d Dept 2017]). Given that the mother established the requisite change in circumstances, Family Court did not err in denying the father's motion to dismiss (see Matter of Caswell v Caswell, 134 AD3d 1175, 1177 [3d Dept 2015]).[FN1]
The father also contends that Family Court placed "undue emphasis" on his financial [*3]circumstances rather than assessing the totality of the circumstances. We disagree. "In making a best interests determination, Family Court must consider a variety of factors, including the quality of the parents' respective home environments, the need for stability in the child's life, each parent's willingness to promote a positive relationship between the child and the other parent and each parent's past performance, relative fitness and ability to provide for the child's intellectual and emotional development and overall well-being" (Matter of Joshua PP. v Danielle PP., 205 AD3d 1153, 1155 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 39 NY3d 901 [2022]). "Given that Family Court is in a superior position to evaluate the testimony and credibility of witnesses, [this Court shall] accord great deference to its factual findings and credibility assessments and will not disturb its determination if supported by a sound and substantial basis in the record" (Matter of Zachery VV. v Angela UU., 192 AD3d 1220, 1223 [3d Dept 2021] [citations omitted]).
The testimony at trial demonstrates that both parents love the child and are committed to seeing her succeed in life. Both parents have fostered her education and provided her with ample opportunity to travel and experience the world. Despite the father's testimony as to his troubled financial situation, both parents provide her with a more than adequate home. However, regardless of their many strengths as parents, their clear disdain for one another is very problematic and is having an obvious effect on the child. She is old enough to understand her parents' animosity toward one another and for it to cause her distress. Given that this is the parties' biggest stumbling block as parents, Family Court had the difficult task of deciphering which custodial situation is in the best interests of the child.
Family Court credited the mother's testimony regarding an incident that occurred after the parties agreed to the terms of the January 2019 order wherein the father contacted the mother and told her that she and the child would never seem him again.[FN2] He asked her to pick up the child and stated that he would no longer exercise parenting time. She did, and then subsequently received a frantic late-night message from the wife that she did not know where the father was and that he was at a hospital. The mother called the wife and the father, and even local hospitals, but received no response and the mother went to the father's house. The father was there and seemed fine; he apologized and asked for extra days to make up the time he missed with the child. The mother granted him extra time and then he would not return the child to her. The mother testified as to another incident wherein the father threatened via email to leave the area and asked the mother to come get the child.[FN3] The court also credited testimony by the mother regarding the father's interference with a video call with [*4]the child while she was with the father as well as the father's problematic behavior during custody exchanges. Additionally, the mother provided testimony about the child's concerning behavior regarding her weight, which seemed to be due to the father's comments. The father often emails the child's teachers to inform them that the child is performing poorly, despite the teachers stating that she was performing well in school. Regarding healthcare, the parties do not appear to be able to cooperate. The father has, on more than one occasion, unilaterally cancelled appointments for the child or scheduled duplicative appointments simply for him to attend. The mother also testified that, in November 2019, the child broke her collarbone and was picked up from school by the father. The father did not inform the mother where he was taking the child and did not reply to any calls or texts for hours. According to the mother, when the father eventually contacted her regarding the incident, he told her that the child did not want to talk to her. The mother also testified to instances where she called the police on the father and instances where he called the police on her.
The wife testified on the father's behalf. Family Court credited her testimony that the child and the father have a good relationship. She also testified to instances of both parties having called the police on one another. The father testified, similar to the mother, as to unsolvable disagreements between the parties regarding education, extracurricular activities and health care for the child. The father admitted to calling the police on the mother, just as she had on him. The father's testimony established that, during the pendency of the fact-finding hearing, the older sibling's mother passed away, the older sibling is now living with the father and the younger sibling was born. The father admitted into evidence a video recording of the child discussing an instance where the mother punished the child by isolating her in her room and removing her bedding and stuffed animals. The child was visibly upset in the video. The father also testified regarding his financial difficulties, including his inability to pay child support for the child for a year, as well as mortgage or utility payments. The court found the testimony regarding his income, real estate and other financial resources to be "sketchy." Most significantly, the court found that the father's testimony regarding his finances "casts doubt on his credibility."
Family Court, in a thorough and well-reasoned decision, found that the hostility between the parents has made it impossible for them to co-parent and, as such, granted the mother's petition seeking sole custody. Although the Court did cite to the father's financial situation, we do not find that the court put an undue emphasis on it. The court pointed to other reasons for the decision that it rendered, including the father's "unjustified contempt for [the mother] which he [*5]does not attempt to hide, and [this hostility] distorts his ability to parent, let alone his ability to co-parent." When discussing the video of the child that the father admitted into evidence, the court pointed out that the video was recorded with the intention of having the child "tattle" on the mother and that, although the father and the wife did, at times, comfort the child, the majority of the time they interrogated her in a manner "designed to stoke her agitation rather than address her emotion." The court pointed out how this could harm the child, especially in the context of co-parenting. Most significantly, the court found that the father is less likely to encourage a healthy relationship between the child and the mother than the mother is between the child and the father. Therefore, considering the totality of the circumstances and deferring to Family Court's credibility determinations, we find that the custody determination and parenting schedule is well supported by a sound and substantial basis in the record (see Matter of Samantha GG. v George HH., 177 AD3d 1139, 1142-1143 [3d Dept 2019]; Matter of Opalka v Skinner, 81 AD3d 1005, 1008 [3d Dept 2011]; Matter of Hissam v Mackin, 41 AD3d 955, 957 [3d Dept 2007], lv denied 9 NY3d 809 [2007]; see generally Matter of Gerber v Gerber, 133 AD3d 1133, 1138-1139 [3d Dept 2015], lv denied 27 NY3d 902 [2016]).
Finally, we are unpersuaded by the father's contention that Family Court erred by deciding not to order forensic or mental health evaluations of the parties. Given that he did not produce any evidence suggesting that the mother had any mental illness,[FN4] we do not find that it was an abuse of discretion for the court to deny this request (see Matter of Yetter v Jones, 272 AD2d 654, 656-657 [3d Dept 2000]; Matter of Thompson v Thompson, 267 AD2d 516, 519 [3d Dept 1999]; Matter of Mitchell v Mitchell, 209 AD2d 845, 847 [3d Dept 1994]). To the extent that the father argues that the court erred in taking judicial notice of a prior mental health evaluation of the father, such argument is without merit as the court did not take judicial notice and such evaluation was not mentioned in the order on appeal.
Clark, J.P., Reynolds Fitzgerald, Ceresia and McShan, JJ., concur.
ORDERED that the order is affirmed, without costs.

Footnotes

Footnote 1: The father also asserts that Family Court erred in allowing testimony from the mother regarding incidents that occurred prior to the January 2019 order and considering it when determining whether the mother had established a change in circumstances. It is clear from the record that the court did not consider these incidents relative to whether a change in circumstances had occurred since the prior order. Given that the court can consider, among other factors, the parties' past performance when reaching the issue of the best interests of the child (see Matter of Joshua PP. v Danielle PP., 205 AD3d 1153, 1155 [3d Dept 2022], lv denied 39 NY3d 901 [2022]), we discern no error in permitting this testimony.

Footnote 2: The mother testified that, while dropping the child off at school, the father gave her two pounds of chocolate and told her that she would not be seeing him again. This upset the child.

Footnote 3: The father admitted to sending this email communication.

Footnote 4: The basis of his request was that the mother took the child to a grocery store during the COVID-19 pandemic.